**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **UNITED STATES OF AMERICA,** |
| v. |
| **ELOHIM BEY CROSS**, |
| Defendant. |

Case No. 09-cr-00281-11 (CRC)

## MEMORANDUM OPINION

In 2011, a jury convicted Defendant Elohim Bey Cross of conspiracy to distribute and possess with the intent to distribute over one kilogram of heroin, and he was sentenced to twenty years in prison. To obtain the conviction, the prosecution had to prove, among other things, that Cross reasonably foresaw that the conspiracy he joined distributed, or intended to distribute, more than one kilogram of heroin. The government met that burden mainly with the testimony of Cross's supplier, who told the jury that he sold Cross 1.2 to 1.3 kilograms for further distribution. In this petition for post-conviction relief under 28 U.S.C. § 2255, Cross contends that his trial counsel was ineffective for failing to use evidence in her possession that would have contradicted the supplier's testimony on this crucial point. For the reasons that follow, the Court agrees that Cross's counsel was deficient in this one respect, and that the error was prejudicial to the jury's drug-quantity finding. It will therefore grant Cross's petition and vacate his sentence. However, as discussed further below, the Court will direct the parties to submit supplemental briefing on the effect of the Court's ruling on Cross's conviction.

## I. Background

In 2009, federal investigators tapped the telephones of Mouloukou Toure, a suspected heroin distributor in Washington, D.C. <u>United States v. Cross</u>, 766 F.3d 1, 2 (D.C. Cir. 2013).[1] Through those wiretaps, they learned that Toure was importing heroin from a Toronto-based supplier operating under the alias "Big Brother," and that Toure was selling that heroin to other, lower-level distributors, including Cross. <u>Id.</u> In numerous wiretapped conversations with Toure, Cross placed narcotics orders in coded language, discussed purchasing prepaid cell phones for the purpose of evading police, and learned about a police raid on Toure's stash house. <u>Id.</u>; <u>see also</u> Gov't's Opp'n Def.'s Mot. Vacate ("Gov't's Opp'n"), Ex. B (wiretap transcripts). The conversations also led the FBI to a Comfort Inn in Maryland, where an agent observed Toure enter and then exit a particular hotel room. <u>Cross</u>, 766 F.3d at 2. Later, an agent obtained records from the hotel's manager, showing that Cross had stayed there for weeks at a time through 2009 and had paid in cash. <u>Id.</u> at 2–3. When Cross learned from a hotel clerk that law enforcement agents had gotten the records, he called Toure in alarm, worried that there were still "things" in his hotel room but hopeful that they would be "hard to find"; Toure told him that he should have been moving locations more frequently, and that he had to "be careful." Gov't's Opp'n, Ex. B, at EC_000033. The FBI searched the hotel room, though, and found bags of heroin and cocaine base in the drawer of a nightstand, plus drug paraphernalia such as surgical face masks, a digital scale, and disposable gloves. <u>Cross</u>, 766 F.3d at 3. After the search, Cross

---

[1] Much of the factual and procedural background relevant to this petition was recounted by the D.C. Circuit on direct appeal. <u>See</u> <u>Cross</u>, 766 F.3d at 2–4. A condensed version appears here, supplemented as necessary with facts relevant to Cross's present arguments.

again called Toure in a panic, looking for guidance.  See Gov't's Opp'n, Ex. B, at EC_000037–38.

In November 2009, a grand jury charged Cross with a single count of conspiring to distribute and possess with intent to distribute one kilogram or more of heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(i) & 846, which carries a mandatory minimum of ten years' incarceration.[2]  In March 2010, the government gave notice pursuant to 21 U.S.C. § 851 that, if convicted, Cross was subject to an enhanced mandatory minimum sentence of twenty years due to a 2007 Maryland conviction for cocaine possession, which carried a maximum punishment of four years' incarceration and therefore qualified as a "felony drug offense" under 21 U.S.C. § 841(b)(1)(i).  See Notice of Prior Felony Convictions, ECF No. 81.[3]  In June 2010, the attorney who would go on to represent Cross during the remaining pretrial, trial, and sentencing phases of the case, first entered her appearance.  See Notice of Attorney Appearance, ECF No. 138.

---

[2] The same indictment also charged Cross with two counts of unlawfully using a communication facility, in violation of 21 U.S.C. § 843(b), but those were later dismissed on the government's motion.  See ECF No. 130.

[3] In August 2013, former Attorney General Eric Holder issued a memorandum instructing federal prosecutors to file such recidivist enhancements under 21 U.S.C. § 851 only where a "defendant is involved in conduct that makes the case appropriate for severe sanctions." Memorandum Regarding "Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases" (Aug. 12, 2013), *available at* https://www.justice.gov/sites/default/files/ag/legacy/2014/04/11/ag-memo-drug-guidance.pdf. The memo further directed prosecutors, in determining whether "severe sanctions" are warranted, to consider factors such as whether "the defendant was an organizer, leader, manager or supervisor of others within a criminal organization," whether the defendant's offense or prior history involved violent conduct, and whether "the filing would create a gross sentencing disparity with equally or more culpable co-defendants." Id. at 3.  Given Cross's role in the charged conspiracy, it is extremely unlikely that the government would have sought a ten-year enhancement under this policy.

Cross went to trial in July 2011.[4]  In addition to introducing the wiretap and physical

evidence detailed above, the government elicited testimony from Toure, who had pled guilty.

His testimony included the statements that he had imported a total of 4.8 kilograms of heroin

from Big Brother, and that he had distributed a total of 1.2 to 1.3 kilograms of that amount to

Cross.  See Trial Tr. 18–19, 33, 65 (July 19, 2011 p.m.); Trial Tr. 36, 48, 50 (July 21, 2011 a.m.).

Toure's testimony was the only evidence at trial regarding these total drug amounts.  In defense,

Cross's counsel pressed the theory that he had merely purchased drugs from Toure as part of a

simple buyer/seller relationship, and that even if that relationship constituted a conspiracy, it was

a much more limited conspiracy than the broader, international one with which Cross was

charged.  Accordingly, counsel asked the trial court to instruct the jury not to convict Cross if it

found that he had engaged in a separate conspiracy with Toure alone.  See Trial Tr. 27 (July 20,

2011 p.m.).

The court rejected that request, finding that there was not sufficient evidence for a

"multiple conspiracies" instruction.  See id. at 24–25.  The court did, however, instruct the jury

that "a simple buyer/seller relationship alone does not make out a conspiracy."  Id. at 51.  During

closing arguments, the prosecution nevertheless argued that a two-man conspiracy—between

Cross and Toure—was sufficient for conviction.  See Trial Tr. 47, 52 (July 21, 2011 a.m.).  It

stressed that Toure's testimony regarding the 1.2 or 1.3 kilograms of heroin he distributed to

Cross was, standing alone, sufficient to establish the drug quantity element of the charge.  See

Trial Tr. 23:7–25 (July 21, 2011 a.m.).  Defense counsel, too, in an effort to discredit the

_____

[4] Retired Chief Judge Roberts presided over the trial.  One other alleged co-conspirator, Antonio Valdez, was tried in June 2011.  The others either accepted guilty pleas or were dismissed from the case.

testimony, nevertheless highlighted it: She called the 1.2/1.3-kilogram figure a "magic number" that Toure "needed to tell" the jury. Id. at 36:4–10.

Although the jury was instructed on two lesser-included offenses with lower drug-quantity elements, see Trial Tr. 54–56 (July 20, 2011 p.m.), it voted to convict on the one-kilogram heroin conspiracy charge. See Verdict Form, ECF No. 327. At sentencing, defense counsel argued that permitting Cross's 2007 Maryland conviction for simple cocaine possession to trigger a ten-year enhancement (for a mandatory minimum of twenty years) under 21 U.S.C. § 841 would violate the Eighth Amendment's cruel-and-unusual punishment bar—in part because, under Maryland law, the offense is considered a misdemeanor. See Def.'s Mem. in Aid of Sentencing 5–7, ECF No. 345; Md. Code Ann., Crim. Law, § 5-601(c)(1). The court rejected that argument, noting that "it's undisputed that [the Maryland conviction] carries a maximum penalty of four years," and that "a qualifying felony drug offense is one that's punishable in excess of one year, regardless of how it's classified by name." Sentencing Tr. 17 (Oct. 21, 2011). At the sentencing hearing, defense counsel also argued that the Presentence Investigation Report should not have attributed more than one kilogram of heroin to Cross. Id. at 5–6. The Court rejected that argument as well, reasoning that the jury had found that drug amount as "an essential element of the charged offense." Id. at 15–16. The Court then sentenced Cross to 240 months' imprisonment.

Represented by new counsel, Cross brought a direct appeal of his conviction on two grounds: that it was error for the trial court not to give the multiple-conspiracies instruction he requested, and that the prosecutor's closing argument that a two-man conspiracy was sufficient to convict was improper. See Cross, 766 F.3d at 2. The D.C. Circuit affirmed Cross's conviction on the ground that any errors on the part of the court or the prosecutor were

harmless—primarily because there was sufficient evidence for the jury to convict Cross of the larger, charged conspiracy.  Id. at 4–8.

In January 2015, Cross filed this *pro se* motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255, identifying fourteen grounds for relief.  Def.'s Mot. Vacate, ECF No. 397 (asserting thirteen grounds for relief); Def.'s Mot. Expand Record, ECF No. 412 (asserting a fourteenth ground for relief).  After the Court appointed him counsel, Cross withdrew nine of those claims.  See Notice Regarding Withdrawal of Claims, ECF No. 440; Second Notice Regarding Withdrawal of Claims, ECF No. 444.[5]  His remaining five claims encompass three main grounds for relief.  Cross argues: (1) that his trial counsel was ineffective for failing to use specific evidence to challenge the drug quantity attributable to him (Grounds III & V); (2) that his trial and appellate counsel were ineffective for failing to challenge, under Carachuri-Rosendo v. Holder, 560 U.S. 563 (2010), the ten-year enhancement of his sentence (Grounds I & IX); and (3) that the prosecution engaged in misconduct by failing to correct Toure's testimony about drug amounts (Ground IV).[6]

After the parties submitted written briefing on the motion, the Court held an evidentiary hearing and oral argument, focused on the claim that trial counsel was ineffective for failing to utilize material evidence suggesting that the quantity of heroin attributable to Cross was under one kilogram.  During the evidentiary portion of the hearing, Cross's trial counsel testified at

---

[5] In separately bringing his fourteenth claim, Cross moved to expand the record to include additional attachments and exhibits.  See Def.'s Mot. Expand Record, ECF No. 412. With the assistance of counsel, he later withdrew that claim, see Second Notice Regarding Withdrawal of Claims, ECF No. 444, so the Court will deny as moot Cross's motion to expand the record.

[6] Grounds III and V assert the same erroneous failure on the part of defense counsel to make use of exculpatory evidence at trial.  Ground III alleges prejudice to Cross's conviction; Ground V alleges prejudice to Cross's sentence.

length regarding her recollection of the relevant trial proceedings and the defense strategy she pursued. She answered questions posed by the Government, Cross's appointed post-conviction counsel, and the Court.

## II. Legal Standard

A defendant may move the sentencing court to vacate his sentence if he believes that it "was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). It is the defendant's burden to show by a preponderance of the evidence that he is entitled to relief. See United States v. Soomai, 23 F. Supp. 3d 9, 11 (D.D.C. 2014) (citing United States v. Pollard, 602 F. Supp. 2d 165, 168 (D.D.C. 2009)); see also United States v. Simpson, 475 F.2d 934, 935 (D.C. Cir. 1973). In making that showing, the defendant is procedurally barred from raising any available claim that he failed to raise on direct appeal, unless he can "demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" United States v. Pettigrew, 346 F.3d 1139, 1144 (D.C. Cir. 2003) (quoting Bousley v. United States, 523 U.S. 614, 622 (1998)). In an exception to this rule, however, a defendant may raise an ineffective assistance of counsel claim "whether or not [he] could have raised the claim on direct appeal." United States v. Rivera-Niebla, 37 F. Supp. 3d 374, 376 (D.D.C. 2014) (citing Massaro v. United States, 538 U.S. 500, 504 (2003)).

## III. Analysis

### A. Ineffective Assistance Claim Based on Drug-Quantity Evidence

To succeed on a claim of ineffective assistance of counsel, a defendant must show both that (1) "counsel's performance was deficient," such that it "fell below an objective standard of

reasonableness," and that (2) "the deficient performance prejudiced the defense." Strickland v. Washington, 466 U.S. 668, 687–88 (1984). Establishing prejudice requires a defendant to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

Cross argues that his trial counsel was ineffective for failing to use evidence in her possession to undermine Toure's testimony regarding the amount of drugs he sold to Cross. Here is the argument: Toure testified that he imported 4,800 grams of heroin from Big Brother; that about 1,500 grams of that amount was distributed to one co-conspirator, Anthony Merritt; and that roughly another 1,300 grams was collectively distributed to Antonio Valdez and another co-conspirator (not Cross). Trial Tr. 65–67 (July 19, 2011 p.m.). Toure also testified that he distributed "[a]pproximately 1200 to 1300 gram[s]" of heroin to Cross. Id. at 33:25. But Cross argues that a chart created by law enforcement detailing the quantities of heroin that the FBI recovered from the alleged co-conspirators, which was produced to the defense in discovery, makes Toure's numbers impossible to reconcile. The document, hereinafter referred to as the "drug-quantity chart," is a four-page spreadsheet titled "Operation Prizefighter: Drug Analysis Summary Chart." Def.'s Reply Supp. Mot. Vacate ("Def.'s Reply"), Attach. at 28–32. It provides the date, location, description, type of controlled substance, and weight in grams for various drug seizures associated with the charged conspiracy. As relevant here, the chart indicates that 623.4 grams of heroin were obtained in "[c]ontrolled buy[s]" from Toure,[7] and that 944.3 grams were seized from Toure's stash house. It also indicates that 1,984.4 grams were

_____

[7] Cross's figure (633.3 grams) is slightly higher, presumably because it includes 9.9 grams of heroin recovered in a controlled buy from another co-conspirator, Jesus Nunez. Because it is not clear whether that amount necessarily came from the 4.8 kilograms Toure imported, the Court uses the more conservative 623.4-gram number.

found in Merritt's stash house, significantly more than the 1,500 grams Toure estimated he distributed to Merritt. Id.

Hypothetically, the amounts recovered from Merritt's stash house could have been from a source other than Toure. However, assuming the truth of Toure's testimony, the amounts seized directly from Toure—i.e., the amounts purchased through controlled buys (623.4 grams) and found in Toure's stash house (944.3 grams)—must have come from the 4.8 kilograms imported from Big Brother. This follows because, according to Toure, Big Brother was his first and *only* heroin source. See Trial Tr. 63:17–25, 65:1–3 (July 19, 2011 p.m.). And when those amounts recovered from Toure are added to the 1,300 grams supposedly distributed to Valdez and the 1,500 grams supposedly distributed to Merritt, the total comes to just under 4,400 grams. That would leave just over 400 grams of heroin for Cross—not the "[a]pproximately 1200 to 1300 gram[s]" that Toure claims to have distributed to him. Trial Tr. 33 (July 19, 2011 p.m.).

The following table summarizes the drug amounts discussed above. It makes clear why—when the amounts distributed or recovered by law enforcement are deducted from the 4.8-kilograms Toure claims to have imported—it is not possible that Toure distributed more than one kilogram of heroin to Cross, as he claimed to have done.[8]

---

[8] Because it is at least possible that the amounts recorded in the chart as being recovered from Merritt (1,984.456 grams) did *not* come from Toure, that amount has—conservatively—not been included in the chart. If that amount did come from Toure, then there would be *no* remaining heroin for distribution to Cross.

***Table Summarizing Key Drug Amounts from Drug-Quantity Chart and Toure's Testimony***

| Description | Evidentiary Source | Heroin Amount |
|---|---|---|
| Total Amount Imported | Toure's Testimony | 4,800 grams |
| Distributed to Valdez | Toure's Testimony | 1,300 grams |
| Distributed to Merritt | Toure's Testimony | 1,500 grams |
| Recovered through Controlled Buys from Toure | Drug-Quantity Chart | 623.4 grams |
| Recovered from Toure's Stash House | Drug-Quantity Chart | 944.3 grams |
| Recovered from Cross | Drug-Quantity Chart | 22.029 grams |
| Possible Amount Remaining for Distribution to Cross | Toure's Testimony and Drug-Quantity Chart | ***432.3 grams*** |
| Amount Toure Claimed to Have Distributed to Cross | Toure's Testimony | ***1,200 to 1,300 grams*** |

Understandably, Cross contends that the drug-quantity chart was highly material, and exculpatory as to the drug quantity attributed to him. Moreover, he has submitted documentation showing that his trial counsel was aware of the information reflected in the chart prior to and during trial. In particular, Cross has submitted a document in his own handwriting, which he supposedly presented to his counsel before trial, calculating imported and recovered drug amounts based on Toure's testimony during his co-conspirator Valdez's trial, and showing that the two columns do not add up. Def.'s Reply, Attach. at 33–34; see also id. at 17–20 (relevant excerpts from Valdez trial). Cross has also attached several documents in his trial counsel's handwriting, reflecting her attempts to reconcile the drug-amount figures. Id. at 21–26. Because his counsel's failure "to introduce [this] highly exculpatory evidence impeaching the testimony of the government's star witness, on an issue going directly to guilt and punishment, was

objectively unreasonable and highly prejudicial," Cross argues, he was unconstitutionally deprived of effective assistance of counsel. Def.'s Reply 3.

### 1. Whether Trial Counsel's Performance Was Deficient

The Court begins by evaluating Strickland's deficiency prong, which turns on whether counsel's performance "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. A lawyer's performance was not objectively reasonable if it was "not supported by a reasonable strategy." Massaro v. United States, 538 U.S. 500, 505 (2003). Of course, there is a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Burt v. Titlow, 134 S. Ct. 10, 12 (2013) (quoting Strickland, 466 U.S. at 690). But a defendant may overcome that presumption by demonstrating either that the relevant decision was not justified by counsel's *actual* trial strategy, or that "no sound strategy posited by the [opposing party, here the government] could have supported the conduct." United States v. Abney, 812 F.3d 1079, 1087 (D.C. Cir. 2016) (quoting Thomas v. Varner, 428 F.3d 491, 500 (3d Cir. 2005)) (alterations in original).

When evaluating counsel's performance, a balance must be struck between surveying the forest and examining the trees. On the one hand, a reviewing court must "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct" and "in light of all the circumstances." Strickland, 466 U.S. at 690. On the other hand, performance that is by-and-large competent cannot cure a singular, constitutionally defective error. See Murray v. Carrier, 477 U.S. 478, 496 (1986) ("[T]he right to effective assistance of counsel . . . may in a particular case be violated by even an isolated error of counsel if that error is sufficiently egregious and prejudicial."); Henry v. Poole, 409 F.3d 48, 72 (2d Cir. 2005) (court may not rely on "counsel's competency in all other respects" in

evaluating effectiveness). In particular, when a lawyer "fails . . . to introduce into evidence[] records that demonstrate [her] client's factual innocence, or that raise sufficient doubt as to that question to undermine confidence in the verdict, [she] renders deficient performance." Hart v. Gomez, 174 F.3d 1067, 1070 (9th Cir. 1999).

This is such a case. Cross has shown that his trial counsel, though competent in all other respects, fundamentally erred—in a manner that neither her own actual strategy nor any "sound strategy" can adequately explain. Abney, 812 F.3d at 1087. It is now clear that counsel possessed the drug-quantity chart and understood the information it contained—and yet, inexplicably, opted not to introduce it as evidence; use it to impeach Toure, the government's star witness; or to employ it in any way to contradict the government's case.

Although counsel did not specifically recall the document at the evidentiary hearing, she confirmed that her handwriting was on it. Ev. Hr'g Tr. 22:12–21. When questioned about whether she was aware of the discrepancy between the drug amounts Toure testified to and the amounts reflected in the document, counsel replied that she "assume[d]" she did know "because [she] had written down all the numbers [and had determined they did not add up]." Id. at 25:12–17; see also id. at 30:5–11 ("[Q:] You do not recall whether you, during trial, realized that the amounts that Mr. Toure was testifying to may be contradicted by the amounts recovered by law enforcement? [A:] I don't recall—I assume that I did because it's annotated in my trial notes, but at this time I don't know what I knew."). Later, trial counsel rejected the notion that not using the document was part of her trial strategy, see id. at 31:18–20, or that employing it might have somehow been harmful to the defense, see id. at 37:15–18. On the contrary, she repeatedly affirmed that the information contained in the document would have *advanced* her objectives at trial. She conceded that the document would have been "more powerful" and "more useful" for

impeaching Toure than the evidence she employed.  Id. at 32:13–19.  And she confirmed that one of her main "trial themes" was that "Cross had a very minor role, if any, in the conspiracy." Id. at 36:13–16; see also Trial Tr. 25, 26, 29, 49 (July 19, 2011 a.m.); Trial Tr. 42, 43 (July 19, 2011 p.m.) (emphasizing the international nature of the conspiracy in order to distance it from Cross).  That theme would have been *underscored* by the drug-quantity chart, showing disproportionately low amounts recovered directly from Cross.  (The chart indicates that only about 22 grams were seized directly from Cross.)  Finally, she testified that she had pursued a line of questioning during her cross-examination of Toure aimed at revealing the very discrepancies that the document—if produced—would have made plain.  Ev. Hr'g Tr. 35:23–36:6 ("[Q:]  What were you trying to do in that cross-examination when you—when you had [Toure] state that he had imported 4800 grams, and then you asked him a series of questions about whom he had distributed those grams to? [A:] I don't remember.  I assume to show through those numbers that there was a difference in what he said and what was possible.  And if I didn't argue it effectively, I'm sorry[.]").[9]

In an apparent attempt to explain her choice not to introduce the chart, Cross's counsel remarked at the hearing:

> My experience has been—and it's unfortunate—that if your defense is, yes, my client's a drug dealer but he's not the drug dealer they're talking about, that all the jury hears is "my client's a drug dealer," and then they hear the defendant talking on the phone, and they don't much care after that whether the conspiracy is a separate conspiracy or it's buyer/seller.  So those are very limited defenses.  And they don't much care whether it was 999 grams or a thousand grams.  And I think it's unfortunate, but that's been what happens in most conspiracy trials.

Ev. Hr'g Tr. 26:24–27:9.  This rationale—that jurors do not care about the size or type of a drug

---

[9] The Court appreciates trial counsel's candor at the hearing under difficult circumstances.

conspiracy once they are convinced the defendant is a drug dealer—cannot reasonably explain trial counsel's decision not to utilize the drug-quantity chart, for at least two reasons. First, the rationale conflicts with the strategy that Cross's counsel actually employed: Her main trial strategy was devoted to establishing either a separate conspiracy or a buyer/seller relationship between Cross and Toure, on the assumption that Cross *was* a drug dealer. Id. at 36:13–16. And she pursued both questioning, see Trial Tr. 65–67 (July 19, 2011 p.m.); Ev. Hr'g Tr. 35:23–36:6, and argument, see Trial Tr. 36:4–10 (July 21, 2011 a.m.), relevant to the drug-quantity element. Second, the one-kilogram quantity was one of three essential elements of Toure's conviction, and arguably the most contested of the three. No "sound strategy," Abney, 812 F.3d at 1087, could support an attorney's decision to ignore evidence raising material doubt as to an essential element of the crime of which her client is accused. See Hart, 174 F.3d at 1070.

Cross, then, has shown that his trial counsel's decision to forego using the drug-quantity chart was not motivated by any actual, sound strategy, at least not any that she is able to recall. What is more, Cross has shown that no "sound strategy posited by the [opposing party, here the government] could have supported the conduct." Abney, 812 F.3d at 1087. In its opposition, the Government contends that Cross's claim "is based on the mistaken legal premise that the amount of heroin that Toure distributed to other members of the conspiracy was not attributable to defendant." Gov't Opp'n 20. Accordingly, says the Government, "even if [trial counsel] had elicited from Toure that he sold [and] stored [the various drug amounts reflected in the document], these amounts . . . nonetheless would have been attributed to the defendant[.]" Id. at 21. Trial counsel's decision not to make use of the document, then, can be justified as an attempt to avoid "emphasiz[ing] the scope of the conspiracy" with "mathematical certainty." Id. at 22.

The Government's argument rests on two main flaws. The first is specific to this case.

At trial, the total amount of heroin that Toure imported from Big Brother (4,800 grams) was not disputed.  So, even presuming that trial counsel expected the jury to hold Cross accountable for that full amount, there would have been no strategic downside to employing the drug-quantity chart.  Presenting that evidence or using it to cross-examine Toure would not have altered the jury's view of the *total* heroin amount Toure imported, but rather would have illustrated how that amount had been *distributed*.  In particular, it would have shown how a disproportionately tiny amount had been recovered directly from Cross, and would thus have reinforced trial counsel's strategy of distancing Cross from the larger conspiracy.  See Ev. Hr'g Tr. 36:13–16 ("[Q:] One of your trial themes was that Mr. Cross was just an apostrophe in the conspiracy with Big Brother? [A:] That's right; that he had a very minor role, if any, in the conspiracy.").

The second error in the Government's argument is legal:  It is simply not the case that the jury, finding that Cross joined a conspiracy, was bound to attribute to Cross all drug amounts associated with Toure.  It is a "well-settled principle of conspiracy law that someone who jointly undertakes a criminal activity with others is accountable for their reasonably foreseeable conduct"—but only that conduct which is "in furtherance of the joint undertaking."  United States v. Saro, 24 F.3d 283, 288 (D.C. Cir. 1994) (citing Pinkerton v. United States, 328 U.S. 640 (1946)).  For that reason, the "extent of a defendant's vicarious liability under conspiracy law is always determined *by the scope of his agreement with his co-conspirators*," and when they are "conducting drug transactions of their own on the side . . . [the defendant] is not automatically accountable for all of those side deals."  Saro, 24 F.3d at 288 (emphasis added); see also United States v. Childress, 58 F.3d 693, 722 (D.C. Cir. 1995) ("[P]roper attribution [of drug amounts] requires analysis of the scope of the conspiracy that the defendant has joined—the scope of his conspiratorial agreement.").

And, unlike the total amount of heroin imported by Toure, the scope of the conspiracy Cross joined *was* in dispute throughout trial. As previously discussed, defense counsel placed the issue at the heart of her trial strategy. <u>See</u> Ev. Hr'g Tr. 36:13–16. Indeed, her ultimate goal was to convince the jury that Cross had a mere buyer/seller relationship with Toure—or, at most, had joined a limited, two-man conspiracy with him. <u>See</u> <u>id.</u> at 20:23–21:6 ("I was making the argument that Mr. Cross was not in the conspiracy that was charged, and that all of the other people in the conspiracy were West African, and that the drugs came from Nigeria up to Canada, and all of the distributors down to D.C. and including Toure were West Africans in order to distinguish Mr. Cross from the other members of the conspiracy and show that he had either a separate conspiracy or a buyer/seller relationship and was not a member of the [larger] conspiracy."). And in closing, the prosecution stressed to the jury that it could convict if it found that Cross joined a two-man conspiracy with Toure. <u>See</u> Trial Tr. 47 (July 21, 2011 a.m.) ("[F]or the purpose of finding [Mr. Cross] guilty of the crime charged, all you need is two, Mr. Cross plus one other person, Mr. Toure."); <u>id.</u> ("[I]n this case we can prove simply Mr. Cross got into an agreement with one other person—that's two—in this case . . . Toure."). In other words, because the scope of the conspiracy was a central dispute at trial, the amount of drugs attributable to Cross was also up in the air. Defense counsel's decision to forego using the drug-quantity chart, therefore, cannot be excused on the rationale that all amounts reflected in the document would have been attributed to Cross *anyway*.

Simply put, neither Cross's trial counsel nor the Government has posited any "sound strategy [that] could have supported" the decision not to utilize the drug-quantity chart. <u>Abney</u>, 812 F.3d at 1087. Cross has thus shown that his trial counsel's performance was deficient in this one material respect.

###### 2. Whether Trial Counsel's Performance Caused Prejudice as to Drug Quantity

The Court now evaluates prejudice under Strickland. Here, Cross's burden is to "show that there is a reasonable probability that, but for counsel's unprofessional error[], the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Cross need not demonstrate that "counsel's deficient conduct more likely than not altered the outcome in the case," but he must do more than establish that "the errors had some conceivable effect." Id. at 693. Simply stated, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." Id. at 695.

There is little doubt that Cross was prejudiced by his trial counsel's failure to make use of the drug-quantity chart in order to discredit Toure, the prosecution's key witness. The one-kilogram drug amount was an essential element of Cross's conviction. Closing arguments from counsel on both sides emphasized to the jury that the 1.2 to 1.3 kilograms of heroin Toure claimed to have distributed to Cross—a claim supported only by Toure's own testimony—was sufficient *by itself* to satisfy that element. See Trial Tr. 23:7–25 (July 21, 2011 a.m.) (Prosecution's Closing Argument) ("[L]et's just talk about the amounts. Now, Mr. Toure testified directly. He told you, Look, I'm not sure I remember exactly, but I—I personally sold to Mr. Cross between 1.2 and 1.3 [kilo]grams of heroin, somewhere around that number . . . . [E]ven if you put the 4.8 kilos [imported by Toure] aside and just look at the 1.2, you have more than enough evidence to find him guilty as charged."); id. at 36:4–10 (Defense's Closing Argument) ("[Mr. Toure] didn't come up with an elaborate scheme of what he did or not, but he told you a magic number. He told you a magic number, that he sold 1.2 kilos to Mr. Cross, or

1.3.  And why that is important is that the single charge is possession with intent to distribute or distribution of 1 kilo or more, so he needed to tell you that the amount that he personally gave to Mr. Cross was 1 kilo or more.").  If deployed effectively, the drug-quantity chart would have at least cast considerable doubt on this key testimony.  There is thus a "reasonable probability" that the jury's verdict as to the essential drug amount element "would have been different" if the chart had been put into play.  Strickland, 466 U.S. at 694.

At the hearing, the Government posited "three separate ways that the jury could have" attributed one kilogram or more of heroin to Cross, even had the document been introduced.  Ev. Hr'g Tr. 57:10–11.  In particular, the Government posited that the jury may have: (1) relied on a reference Toure made to a potential "side deal" with Cross to purchase one kilogram of heroin from Big Brother; (2) tied Cross to the broader conspiracy and attributed to him all 4.8 imported kilograms; or (3) attributed to Cross the drug amounts recorded in the document that were seized directly from Toure—i.e., the amount obtained through controlled buys from Toure (623.4 grams) plus the amount recovered from Toure's stash house (944.3 grams).  Id. at 57:11–16, 60:3–14.  The Government did not specifically address the issue of prejudice with respect to drug quantity in its written submissions, nor did it explain how any of the above alternatives were more than "possible," which is not the relevant standard.  After all, the mere *possibility* of one outcome does not foreclose the "reasonable probability" of another.  For these reasons, it is debatable whether the Government has properly presented to the Court any arguments regarding prejudice *as to the drug quantity element*.  Regardless, for the sake of thoroughness, the Court will evaluate each proposed alternative, considering whether individually or taken together they foreclose the "reasonable probability" that the jury, in light of the drug-quantity chart, would

have attributed less than one kilogram to Cross.[10]

    a.  Supposed One-Kilogram Side Deal Between Cross and Toure

First, the Court finds it highly unlikely that the jurors would have relied upon the supposed one-kilogram side deal between Toure and Cross to reach the drug amount threshold, particularly assuming the use of the drug-quantity chart.  The only evidence of that alleged deal came from Toure's testimony that he and Cross "had talked about putting up some money together and buy[ing] [a] kilo of heroin for the two of us."  Trial Tr. 25:2–3 (July 19, 2011 p.m.).  But Toure went on to clarify that the transaction had "never happened."  Id. at 25:22.  Toure claimed that Cross was alluding to this proposed deal in one of their wiretapped conversations, see id. at 24:18–25:3, but the relevant wiretap reveals no details about the specific nature of that previous discussion, let alone any details regarding drug amounts, see Gov't Opp'n, Ex. B, at EC_000016–18.  In other words, the evidence regarding the inchoate deal was vague and inconclusive.  Plus, because that evidence was almost exclusively in the form of testimony from Toure, its value would have been severely undermined had Toure been impeached with the drug-quantity chart.  The Court therefore finds it implausible that the jury would have reached the one-kilogram quantity threshold by such a route.

_____

    [10] The Government might have proposed a fourth alternative but, for good reason, did not.  During its closing argument, the prosecution suggested to the jury that it could find the one-kilogram element based on some of the wiretapped phone conversations between Cross and Toure.  Trial Tr. 23:25–26:1 (July 21, 2011 a.m.).  Some of the conversations the prosecution cited obliquely reference drug purchases, but only one can be understood to reference an identifiable drug quantity (of 150 grams).  See Gov't Opp'n, Ex. B, at EC_000031 ("dollar fifty cent ticket" presumably referring to 150 grams of heroin).  If anything, this line of argument reinforced the notion in the jury's mind that the quantity of drugs properly attributable to the conspiracy Cross joined was the quantity Cross agreed to purchase from Toure.  However, it is clear that the calls alone did not provide sufficient evidence to ground the one-kilogram element.

As a second alternative, the Government suggests that the jury—even with awareness of the information in the drug-quantity chart—may have attributed to Cross the full amount of heroin Toure imported from Big Brother (4.8 kilograms). That is possible, and was a permissible finding as a matter of law, but in light of the evidence and counsel's arguments to the jury, the Court considers it more likely—and at least, reasonably probable—that the jury instead found a limited, two-person conspiracy between Cross and Toure. As the Court has already discussed, the prosecution argued to the jury that a two-man conspiracy was sufficient for conviction, see Trial Tr. 47 (July 21, 2011 a.m.), and defense counsel employed a strategy aimed at convincing the jury that Cross had joined, at most, a two-man conspiracy with Toure, see Ev. Hr'g Tr. 20:23–21:6; see also Trial Tr. 25, 26, 29, 49 (July 19, 2011 a.m.); Trial Tr. 42, 43 (July 19, 2011 p.m.) (emphasizing the international nature of the conspiracy in order to distance it from Cross). Those arguments were consistent with the evidence: All wiretapped conversations introduced at trial were between Toure and Cross, and there was no evidence of contact between Cross and any other alleged co-conspirators. To be sure, there was limited evidence introduced that Cross was aware of Toure's other alleged co-conspirators, see Gov't's Opp'n, Ex. B, at EC_000001 (wiretap conversation with Cross in which Toure references his "connect," supposedly Big Brother), but the lion's share of the evidence connected Cross to Toure, and no one else.[11] For

_____

[11] The D.C. Circuit concluded that there was sufficient evidence to convict Cross under a broader "chain conspiracy" theory, which does not require evidence directly linking the defendant to all members of the charged conspiracy. See Cross, 766 F.3d at 6. But the Circuit never concluded that there was *in*sufficient evidence for finding a two-person conspiracy. Indeed, it assumed without deciding that the jury found exactly that. See id. at 5 ("[W]e are assuming for purposes of argument that the district court erred in declining to give a multiple conspiracies charge, [and] we will likewise assume that a variance involving multiple conspiracies occurred."). And the Circuit never made any findings about the *likelihood* of a two-

these reasons, the Court finds it reasonably probable that the jury found a two-man conspiracy between Cross and Toure, and therefore reasonably probable that it would *not* have attributed the full 4.8 kilograms to Cross.

c. Attributing Drug Amounts Seized Directly from Toure

The Government's final suggested alternative—that the jury may have attributed to Cross drug amounts recorded in the drug-quantity chart that were reportedly seized directly from Toure—is problematic for a host of reasons. For one, the chart is the only evidentiary source for the amounts the Government references (623.4 grams in controlled buys from Toure and 944.3 grams from Toure's stash house). Accordingly, the Government's proposal requires considering counterfactuals upon counterfactuals: It requires concluding that the jury was likely to have found the required one-kilogram drug quantity on the basis of evidence that was not actually introduced. This begs the question whether a court could ever be "confiden[t] in [an] outcome" derived from hypothetically introduced evidence. Strickland, 466 U.S. at 694.

However, even assuming that the chart had been used as evidence, and assuming that hypothetical evidence can ever foreclose a finding of prejudice, the evidence does not do so here. In short, the Court finds it likely that, had the jury considered the information contained in the drug-quantity chart as evidence, it would *not* have ascribed the amounts in that document to Cross—even those amounts that were recovered directly from Toure. As discussed previously, the "proper attribution [of drug amounts] requires analysis of the scope of the conspiracy that the defendant has joined—the scope of his conspiratorial agreement." Childress, 58 F.3d at 722. Due to the nature of the evidence introduced at trial, it is reasonably likely that the jury not only

_____

person conspiracy finding. Its holding therefore sheds little light on the issue at hand—i.e., whether a two-person conspiracy finding was reasonably probable.

found a two-man conspiracy between Cross and Toure, but that it defined the scope of their agreement narrowly—i.e., to include the heroin Toure distributed to Cross, but to exclude Toure's other sales and distributions as "side deals," Saro, 24 F.3d at 288. That follows because the wiretapped conversations introduced at trial were not only exclusively between Toure and Cross—they were *about* Toure distributing heroin *to* Cross. (For instance, never was there a discussion about Cross assisting Toure with any of his own direct sales, or even being aware of those direct sales.) Similarly, the testimony at trial indicated that the Comfort Inn room, where the FBI recovered small amounts of heroin and drug paraphernalia, was used for only two main purposes: Toure's sale of heroin to Cross, and Cross's repackaging of heroin for sale. Trial Tr. 26–28 (July 19, 2011 p.m.).[12] For these reasons, there is at least a reasonable probability that, viewing the drug-quantity chart, the jury would have located the drugs sold directly by Toure beyond the scope of Cross's agreement. There is a better argument that the jury would have considered drugs merely *possessed* by Toure to be within the conspiracy's scope; presumably, there was a chance those drugs would be later distributed to Cross. But that contention, too, is on shaky ground, considering the relative drug amounts that the document actually reveals: In short, it directly ties large quantities to Toure (over 1,500 grams) and Merritt (nearly 2,000 grams), but less than 25 grams to Cross. Seeing those amounts, there is *at least* a reasonable probability that the jury would have considered the amounts recovered from Toure's stash house

_____

[12] Toure's testimony on this point was as follows: "[Q:] Other than Mr. Cross, did you know anyone at that Comfort Inn? [A:] No, sir. [Q:] And when you go to the Comfort Inn, what are you there to do? [A:] To deliver the heroin. [Q:] Was there ever a time that you went to the Comfort Inn where you didn't deliver heroin to Mr. Cross? [A:] No, not that I can think of. [Q:] When you were inside Mr. Cross's hotel room, what would you do with the heroin? [A:] Just give it to him. Hand it to him." Trial Tr. 26:16–27:2 (July 19, 2011 p.m.). Toure went on to describe some of Cross's drug paraphernalia, and testified that he once observed Cross bagging heroin in the hotel room. Id. at 27–28.

as unintended for distribution to Cross.[13]  For all of the above reasons, the Government's contention that the jury would have attributed to Cross the chart's drug amounts tied directly to Toure does not foreclose a finding of prejudice as to drug quantity.

To summarize, none of the Government's proposed alternative jury findings, even when considered together, are so likely that they make the contrary result less than reasonably probable.  The prosecution and the defense highlighted Toure's drug quantity testimony to the jury in closing, instructing it that its verdict could depend on its view of that evidence.  It is possible that the jurors disregarded the prosecution's closing invitation to "put the 4.8 kilos aside and just look at the 1.2," Trial Tr. 23:23–24 (July 21, 2011 a.m.), but it is (at least) reasonably probable that they did not, thereby resting their verdict on evidence that could and should have been impeached.  That probability is "sufficient to undermine confidence in the outcome," Strickland, 466 U.S. at 694, and to establish prejudice with respect to the drug-quantity element of Cross's conviction.

### 3. *Whether Trial Counsel's Performance Otherwise Caused Prejudice*

Aside from the drug-quantity element, there were two other essential elements of Cross's conviction: (1) that the charged conspiracy existed between two or more persons and (2) that Cross "knowingly joined and participated in the conspiracy, and did so with the specific intent that heroin be distributed or possessed with the intent to distribute it."  Trial Tr. 49:21–50:9 (July 20, 2011 p.m.).  Cross contends that failing to use the drug-quantity chart prejudiced not only the jury's one-kilogram finding, but also "the jury's determination of whether Mr. Cross was guilty

_____

[13] Even if the jury attributed to Cross the amount possessed by Toure but not sold directly by him, on the theory that it might be intended for distribution to Cross, that would still fail to clear the one-kilogram quantity threshold.

of conspiracy at all." Def.'s Reply 10. Cross points to a particular jury instruction, which was given to aid the jury in distinguishing between a "conspiracy" and "a simple buyer/seller relationship." Trial Tr. 51 (July 20, 2011 p.m.). The court directed the jury, in making that determination, to "consider all of the evidence, including the following [six] factors," one of which was "whether the transaction involved large quantities of heroin." Id. In Cross's view, then, the jury surely considered Toure's testimony regarding large drug amounts as evidence of whether Cross entered into a conspiracy with Toure in the first place. See Def.'s Reply 10.

That may be so. As recounted above, however, there was abundant evidence introduced at trial that Cross entered into a conspiracy with Toure. The jury heard numerous wiretapped telephone calls between the two men. In one, Toure confided to Cross that the police had raided his stash house and arrested his friend, whom Toure now openly feared would "open his mouth." See Gov't Opp'n, Ex. B, at EC_000002–06. In another wiretapped call, Toure and Cross discussed purchasing prepaid cell phones to avoid police detection. Id. at EC_000017–18. After the hotel clerk alerted Cross to an inquiry from law enforcement regarding his hotel room, Cross phoned Toure to express his alarm and ask for advice: Among other things, Toure told him that he should have been "switch[ing] spaces" and that he "got to be careful." Id. at EC_000032_36. Similarly, after Cross's hotel room was raided, he called Toure; Cross wanted to meet up, so that the two could "talk . . . face to face." Id. at EC_000037–38. And of course, these wiretapped conversations are all corroborated and contextualized by the physical evidence seized from Cross's hotel room, for which he had "paid exclusively in cash" for stays lasting "weeks at a time." Cross, 766 F.3d at 2–3. As detailed above, that physical evidence included numerous

ziplock bags of heroin and various drug paraphernalia.  Id. at 3.[14]

In short, there was abundant evidence, independent of Toure's testimony, confirming Cross's participation in a heroin distribution conspiracy.  As a result, there is no "reasonable probability," Strickland, 466 U.S. at 694, that the jury would have reached a different conclusion regarding Cross's involvement in the conspiracy had the drug-quantity chart been effectively used to discredit Toure's testimony.

B.  Cross's Other Claims

1.  *Challenge Based on Carachuri-Rosendo*

Cross also contends that his trial counsel erred in failing to challenge his sentence enhancement by citing the Supreme Court's then-recent decision in Carachuri-Rosendo v. Holder, 560 U.S. 563 (2010).  As discussed above, Cross's offense of conviction, 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(i) & 846, carries a mandatory minimum of ten years' imprisonment.  That jumps to twenty years, however, where the government chooses to give notice that a defendant has been convicted of a prior "felony drug offense."  21 U.S.C. § 841(b)(1)(A).  A "felony drug offense" is defined as one "that is punishable by imprisonment for more than one year under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs[.]"  21 U.S.C. § 802(44); see also Burgess v. United States, 553 U.S. 124, 126 (2008) (holding that the term "felony drug offense" in § 841(b) is defined by § 802(44)).  Therefore, where a defendant has been previously convicted of a state drug offense with a maximum prison term greater than one year, even where that prior offense is characterized

_____

[14] Cross argues that, without credible testimony from Toure to explain the wiretaps, "the government's case would have been little more than a collection of shreds showing . . . that [Cross] was a small-time dealer involved in buying and selling drugs from Toure."  Def.'s Reply 18.  However, the Court finds that, on the question of whether Cross entered into a heroin conspiracy with Toure, the wiretap conversations recounted above largely speak for themselves.

as a misdemeanor under state law, § 841(b)(1)(A)'s ten-year enhancement applies.  See Burgess,

553 U.S. at 126–27.  Because Cross had been convicted in 2007 under Maryland law for cocaine

possession, an offense carrying a four-year maximum term of imprisonment, see Md. Code Ann.,

Crim. Law, § 5-601(c)(1), the trial court applied the enhancement.  Trial Tr. 17 (Oct. 21, 2011).

Cross argues that his counsel was ineffective in failing to challenge this enhancement

under Carachuri-Rosendo, 560 U.S. 563.  That case held that a second state-drug-possession

conviction does not qualify as an "aggravated felony" under the Immigration and Nationality Act

("INA"), 8 U.S.C. § 1229b(a)(3), unless that subsequent conviction is actually prosecuted as a

recidivist offense, meaning that the conviction was in fact based on a prior-offense enhancement.

Id. at 566.  That followed because an "aggravated felony" includes "any felony punishable under

. . . the Controlled Substances Act" ("CSA"), 18 U.S.C. § 924(c)(2), which for a state offense

means that it must "proscribe[] conduct punishable as a felony under [the CSA]."  Id. at 569

(quoting Lopez v. Gonzales, 549 U.S. 47, 56 (2006)).  And under the CSA, a subsequent

possession conviction is punishable as a felony only where the prosecutor has actually charged

the existence of the prior possession conviction.  Carachuri-Rosendo, 560 U.S. at 568–69.

Cross's sentencing enhancement, of course, was in no way based on the application of the

INA's "aggravated felony" provision.  But he suggests that Carachuri-Rosendo's discussion of

what makes a "felony punishable . . . under the [CSA]," see 18 U.S.C. § 924(c)(2), somehow

bears on the proper interpretation of "felony drug offense" in the 21 U.S.C. § 841(b)(1)(A)

enhancement provision.  It does not.  In fact, although there is verbal overlap between the two

provisions, they are defined and analyzed in distinct ways.  As explained above, a state offense is

"punishable" as a felony under the CSA—and therefore an "aggravated felony" under the INA—

when the conduct it prohibits could be punished as a CSA felony.  Lopez, 549 U.S. at 56.  By

contrast, a "felony drug offense" under 21 U.S.C. § 841(b)(1)(A) is defined, in express statutory terms, by reference to the maximum term of imprisonment authorized by *state* law. See 21 U.S.C. § 802(44) (defining "felony drug offense" as one "punishable by imprisonment for more than one year under any law . . . of a State . . . that prohibits or restricts conduct relating to narcotic drugs[.]"); Burgess, 553 U.S. 124. Due to these distinctions, numerous courts have rejected attempts to conflate the two provisions—and their two corresponding lines of cases. See, e.g., Stewart v. Warden, FCC Coleman-Low, 589 F. App'x 934, 937 (11th Cir. 2014) ("[Carachuri-Rosendo's] ultimate holding that non-recidivist simple drug possession could not be an 'aggravated felony' has no bearing on whether such an offense could be a 'felony drug offense' under 21 U.S.C. § 841."); Gargano v. United States, 2014 WL 1725736, at *5 (S.D.N.Y. Apr. 30, 2014) ("[U]nlike Carachuri–Rosendo [the defendant here] was actually convicted of a [state] crime [for which he] actually faced a maximum penalty of five years imprisonment.").

Cross recognizes that courts have not accepted the arguments he advances. But he nonetheless maintains that his counsel was ineffective for failing to press the arguments before the trial court. See Def.'s Reply 26. He points to United States v. Abney, 812 F.3d 1079 (D.C. Cir. 2016), where the D.C. Circuit deemed counsel ineffective for failing to seek a continuance so that the defendant could be sentenced after the signing of the Fair Sentencing Act ("FSA"), which if applied retroactively to defendant's pre-Act conduct would have cut in half the mandatory minimum penalty for his offense. Id. at 1082–83. Although at the time of sentencing, it was unclear whether the Act would be found retroactive (as it later was found to be, see Dorsey v. United States, 132 S. Ct. 2321 (2012)), counsel was nevertheless deemed ineffective for failing "to consider the FSA carefully enough to recognize there was more than one available interpretation [of retroactivity] courts were reasonably likely to adopt—one of

which would benefit his client[.]"  Id. at 1091.

This is clearly not a case like Abney, however.  Cross has not put forth any beneficial interpretation of Carachuri–Rosendo that "courts were reasonably likely to adopt."  Rather, the parallels he seeks to draw between Carachuri-Rosendo and 21 U.S.C. § 841(b)(1)(A)'s sentencing enhancement provision are strained, and no court has adopted them.[15]  Accordingly, his trial counsel's failure to raise those arguments was not deficient.  See United States v. Watson, 717 F.3d 196, 198 (D.C. Cir. 2013) ("[C]ounsel does not perform deficiently by declining to pursue a losing argument."); United States v. Marshall, 669 F.3d 288, 293 (D.C. Cir. 2011) ("[C]ounsel need not raise every conceivable non-frivolous argument in order to provide objectively reasonable representation.").  And nor could trial counsel's performance be prejudicial, since it is not reasonably probable that a court would have accepted such arguments. See Strickland, 466 U.S. at 687.  For the same reasons, Cross's appellate counsel was not deficient for failing to argue trial counsel's ineffectiveness on these grounds.  Robbins, 528 U.S. at 288 ("[A]ppellate counsel . . . need not (and should not) raise every non[-]frivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal.").  The Court therefore rejects Cross's ineffectiveness arguments grounded in Carachuri-Rosendo.

### 2.  Prosecutorial Misconduct Claim

Finally, Cross alleges that the prosecution knowingly elicited false testimony from Toure regarding the quantity of heroin he sold to Cross.  According to Cross, because the prosecution possessed the above-referenced drug-quantity chart showing where much of the heroin from the

---

[15] While Carachuri-Rosendo has been applied in non-immigration cases, see, e.g., United States v. Simmons, 649 F.3d 237, 243 (4th Cir. 2011) (holding that defendant's prior conviction for first-time marijuana possession did not qualify as a predicate felony conviction under North Carolina sentencing regime), Cross has pointed to no court that has read Carachuri-Rosendo to inform the meaning of "felony drug offense" under 21 U.S.C. § 841's enhancement provision.

conspiracy was recovered, it must have known that Toure's testimony was false.

Cross did not raise this claim on direct appeal. Generally, a defendant seeking post-conviction relief is barred from raising any claim that he has procedurally defaulted by failing to raise it on direct appeal. See Bousley, 523 U.S. at 622. A defendant may, however, raise a claim for the first time in a § 2255 proceeding if he can show "cause" for his failure to raise it previously and "prejudice" as a result of his failure, or if he can show "actual innocence." See id. In his motion to vacate his sentence, Cross states that the reason he failed to raise it is "because appellate counsel chose not to." Def.'s Att. A at 9, ECF No. 397-1. He urges the Court to liberally construe his *pro se* petition "as asserting ineffective assistance by his appellate counsel as the cause for this procedural default." Def.'s Reply 22.

Even if the Court were to do so, however, the claim fails on the merits. Under Napue v. Illinois, 360 U.S. 264, the government "may not knowingly use false evidence, including false testimony," or "allow[] it to go uncorrected when it appears." Id. at 269. "A Napue violation occurs when the government introduces false or misleading testimony or allows it to go uncorrected . . . even though the government knew or should have known that the testimony was false[.]" United States v. Straker, 800 F.3d 570, 603 (D.C. Cir. 2015) (citations omitted). Although the drug-quantity chart certainly casts doubt on Toure's testimony, Cross has not shown that Toure's statement that he distributed 1.2 to 1.3 kilograms of heroin to Cross was actually false, much less that the prosecution knew it to be so. There are ways to square that statement with the drug-quantity chart. Most obviously, Toure's estimate of the total quantity imported (4.8 kilograms) may have been too low. Or his statements about the quantity he sold co-conspirators—which were elicited on cross over the prosecution's objection, and which Toure acknowledged to be estimates—might have been too high. See Trial Tr. 66–67 (July 19, 2011

p.m.); see also Hayes v. Ayers, 632 F.3d 500, 520 (9th Cir. 2011) (finding no obligation to correct allegedly false testimony where testimony "was mostly equivocal"). For all of the foregoing reasons, the Court will reject Cross's claim of prosecutorial misconduct.

**IV. Remedy and Conclusion**

In accordance with the above discussion, the Court will grant Cross's motion for post-conviction relief pursuant to 28 U.S.C. § 2255. Cross's sentence rested on the jury's one-kilogram heroin amount finding, see Sentencing Tr. 15–16 (Oct. 21, 2011), which Cross has shown was prejudiced by his trial counsel's ineffectiveness. Cross's sentence was therefore "imposed in violation of the Constitution or laws of the United States," 28 U.S.C. § 2255(a), and will be vacated.

However, the Court has also determined that the prejudice stemming from trial counsel's ineffectiveness was limited to the drug-quantity element of Cross's conviction, and that Cross's other grounds for post-conviction relief are unavailing. Furthermore, the jury was instructed, and impliedly made a guilt determination, on two lesser-included offenses with lower drug-quantity thresholds. See Trial Tr. 54–56 (July 20, 2011 p.m.); Verdict Form, ECF No. 327. The Court will therefore request further briefing on the effect of the Court's prejudice finding on Cross's conviction.

An appropriate Order accompanies this Memorandum Opinion.

Christopher R. Cooper
CHRISTOPHER R. COOPER
United States District Judge

Date: April 18, 2017